**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-cv-21089-ALTMAN/Reid**

**JEFFREY FIORENTINO**, *et al.*,

      *Plaintiffs*,

*v.*

**CANTIERE DELLE MARCHE**
S.r.L. Societa Unipersonale, *et al.*,

      *Defendants*.

_____/

**ORDER**

The Defendants have filed a Motion to Compel Arbitration (the "Motion") [ECF No. 24], asking us to stay this case and order the Plaintiffs to arbitrate their claims in London, England. After careful review of the Motion, the record, and the governing law, we **GRANT** the Defendant's Motion to Compel Arbitration [ECF No. 24] and **STAY** this case pending the outcome of that arbitration.

**THE FACTS**[1]

In 2018, Jeffrey Fiorentino, our Plaintiff, engaged Italian yacht manufacture Cantiere Delle Marche ("CDM"), our Defendant, to build him a custom explorer yacht. *See* Complaint [ECF No. 1] ¶¶ 1–20. To consummate their agreement, the parties entered into a "Standard Yacht Construction

---

[1] In reviewing a motion to compel arbitration, we may consider allegations of fact from "the pleadings, documents of uncontested validity, and affidavits or depositions submitted by either party[.]" *Chemaly v. Lamp*, 2024 WL 663654, at *3 (S.D. Fla. Feb. 16, 2024) (Bloom, J.) (quoting *Bertram v. Beneficial Consumer Discount Co.*, 286 F. Supp. 2d 453, 456 (M.D. Pa. 2003)). But, because "[t]he party opposing a motion to compel arbitration or to stay litigation pending arbitration has the affirmative duty of coming forward by way of affidavit or allegation of fact to show cause why the court should not compel arbitration," *Sims v. Clarendon Nat'l Ins. Co.*, 336 F. Supp. 2d 1311, 1324 (S.D. Fla. 2004) (Altonaga, J.), we must resolve all disputes of material fact regarding the "formation" of the agreement in favor of the nonmoving party, *see Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) ("[A court] may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if there is no genuine dispute as to any material fact concerning the formation of such an agreement." (cleaned up)).

Contract" in April 2019. Mot. at 3 ("[O]n or about April 21, 2019, [CDM] entered into a Standard Yacht Construction Contract with Jefferey Fiorentino and/or assigns."); *see also* Ex. A to Declaration of Carlo Aquilanti (the "Contract") [ECF No. 26-1] at 9–62. The Contract set a purchase price for the Yacht of €9,000,000.00. *See* Contract § 3.1.

The Contract included a "Publicity and Confidentiality" Section, *id.* § 20.1, through which CDM was granted the right to "take photographs and video footage of the Yacht during construction and sea trials and at the time of delivery"—and to "publi[sh] . . . images and a brochure of the Yacht for advertising purposes," *ibid.*[2] The Plaintiffs also agreed to "make the Yacht available to [CDM] for exhibition" at the 2021 Fort Lauderdale International Boat Show (the "2021 FLIBS"), set for October 30, 2021, and to put "the Yacht at [CDM's] disposal for any further promotional initiative in Florida or elsewhere[.]" *Id.* § 20.1.1. CDM, in turn, "was required to pay all costs associated with exhibiting the vessel at the 2021 [FLIBS]." Compl. ¶ 22; *see also* Contract § 20.1 (providing that CDM shall "bear all costs in relation to such exhibition"). The Contract also included an arbitration clause, which made clear that "all disputes arising under this Contract . . . will be submitted to and settled by binding Arbitration in London in accordance with the Arbitration Act 1996 (or any re-enactment or modification for the time being in force) and the rules then in force of the London Maritime Arbitrators' Association[.]" Contract § 17.3.

After the parties signed the Contract on April 21, 2019, "the project was shelved by [CDM] and did not begin for several months." Compl. ¶ 23. And, "when the build eventually began, problems arose and snowballed." *Id.* ¶ 24. Because of these delays, CDM informed Fiorentino that "it would be

---

[2] A Co-Plaintiff in this case, 106 Fishplorer, LLC (a holding company created by Jeffrey Fiorentino), *see* Declaration of Carlo Aquilanti [ECF No. 26-1] ¶ 10, holds the copyright to the Plaintiffs' photographs of the Yacht, *see* Compl. ¶ 56 ("As of February 17, 2023, Plaintiff[ ] Fishplorer has been and still is the holder of the exclusive rights under the Copyright Act of 1976 . . . to reproduce, distribute, display, or license the reproduction, distribution, and/or display of its photographs of the vessel.").

impossible to deliver the vessel in time to display it at the 2021 FLIBS." *Id.* ¶ 25. Accordingly, the parties, on January 7, 2022, "executed an addendum to the Contract which modified the publicity provision," Plaintiffs' Response ("Resp.") [ECF No. 27] at 2, allowing CDM to display the yacht "at the [October 2022] Fort Lauderdale International Boat Show . . . and at any other following Boat Show"—and, again, to use the Yacht "for any further promotional initiative [i]n Florida or elsewhere . . . while the yacht is available," Ex. C to Declaration of Carlo Aquilanti (the "Addendum") [ECF No. 26-1] at 70–72. According to Fiorentino, the parties *also* entered into a subsequent "oral agreement" that allowed CDM "to use photographs of the vessel during the Cannes Boat Show, which was scheduled for September 4–12, 2022." Compl. ¶ 32. CDM agreed to cover "all expenses associated with [that] exhibition." *Id.* ¶ 33.

When CDM "failed to reimburse Fiorentino for all costs associated with the Cannes Boat Show," *id.* ¶ 35, "Fiorentino declared a breach[,] . . . specifically revoked any prior permissions he had granted [to the] Defendants to use Fiorentino's copyrighted images, and demanded[ ] in writing that Defendants discontinue use of these copyrighted images," *id.* ¶ 36—a demand CDM has since ignored, *see id.* ¶ 37 ("Notwithstanding Plaintiff's demand, Defendants have continued to use, without authorization, copyrighted photographs of the boat.").

Fiorentino then sued CDM—along with its founder and CEO, Vasco Buonpensiere—alleging claims for breach of contract, *see id.* ¶¶ 38–45 (Count I), account stated, *see id.* ¶¶ 46–54 (Count II), and copyright infringement, *see id.* ¶¶ 55–63 (Count III). The Defendants have since filed a Motion to Compel Arbitration, invoking the Contract's arbitration provision. *See* Mot. at 1 (requesting that we "compel[ ] the Plaintiffs to arbitrate the claims asserted in this action before, and in accordance with the rules of, the London Maritime Arbitrators' Association, in accordance with the applicable terms of the parties' Standard Yacht Construction Contract"). While that Motion was pending, the Plaintiffs

voluntarily dismissed their claims against Buonpensiere. *See* Notice of Voluntary Dismissal [ECF No. 35]. We'll thus consider only whether the Plaintiffs' claims against CDM must be sent to arbitration.

## THE LAW

Chapter 2 of the Federal Arbitration Act provides that a "written" arbitration provision "in any maritime transaction or a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" *Cosgun v. Seabourn Cruise Line Ltd. Inc.*, 666 F. Supp. 3d 1270, 1280 (S.D. Fla. 2023) (Altman, J.) (emphasis omitted) (quoting 9 U.S.C. § 2). "This provision reflects both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1349 (11th Cir. 2014) (cleaned up). "The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the 'Convention') is incorporated into federal law by the Federal Arbitration Act ('FAA'), which governs the enforcement of arbitration agreements, and arbitral awards made pursuant to such agreements, in federal and state courts." *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard B.V.*, 2020 WL 5627263, at *2 (S.D. Fla. June 8, 2020) (Williams, J.), *aff'd* 855 F. App'x 468 (11th Cir. 2021).

An arbitration agreement falls within the jurisdiction of the New York Convention if it: (1) is in writing; (2) involves at least one foreign party; and (3) "arise[s] out of a legal relationship, whether contractual or not, which is considered as commercial[.]" *Cosgun*, 666 F. Supp. 3d at 1280 (quoting 9 U.S.C. § 202). If these jurisdictional elements are met, "the Convention requires that a motion to compel arbitration must be granted," *Suazo v. NCL (Bah.), Ltd.*, 822 F.3d 543, 546 (11th Cir. 2016), "unless the Court finds that the said agreement is null and void, inoperative or incapable of being performed," *Cosgun*, 666 F. Supp. 3d at 1293 (cleaned up) (quoting Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(3), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3); *see also Lindo v. NCL (Bah.), Ltd.*, 652 F.3d 1257, 1276 (11th Cir. 2011) ("[A] court must order

arbitration unless (1) the . . . jurisdictional prerequisites are not met or (2) an affirmative defense under the New York Convention applies."). "The limited scope of the Convention's null and void clause must be interpreted to encompass only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." *Ibid.* (cleaned up) (quoting *Bautista v. Stat Cruises*, 396 F.3d 1289, 1302 (11th Cir. 2005)).

In "deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In doing so, we apply "a summary judgment-like standard[.]" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). As such, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Ibid.* (quoting FED. R. CIV. P. 56(a)).

## ANALYSIS

The parties disagree on the central question we face here—whether this case must be sent to arbitration in London. CDM says that all three of the Complaint's counts "arise from the Contract" and thus belong in arbitration. Mot. at 9. We'll address each count in turn. And, having determined that the counts do, in fact, arise from the Contract, we'll consider—and reject—the Plaintiffs' affirmative defenses to arbitration.

### I.   The Plaintiffs' Contract Claims

We'll start with the Plaintiffs' claims for breach of contract, *see* Compl. ¶¶ 38–45 (Count I), and account stated, *see id.* ¶¶ 46–54 (Count II).[3] In CDM's view, those "claims . . . for reimbursement

---

[3] We'll consider these together because claims "for accounts stated" are "alleged in the alternative to . . . breach of contract claims." *James Dar, LLC v. OJ Commerce.com, Inc.*, 2022 WL 18463415, at *1 (S.D. Fla. Dec. 22, 2022) (Smith, J.); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 282 (Am. L. Inst. 1981) ("If a debtor and a creditor make an agreement in the nature of a compromise or liquidation

of expenses incurred in the Cannes Boat Show . . . arise directly under § 20.1 of the Contract," Mot. at 3, and, therefore, must be sent to arbitration in London. We agree.

Where a contract includes a valid arbitration clause, we must order arbitration "unless (1) the . . . jurisdictional prerequisites are not met . . . or (2) one of the Convention's affirmative defenses applies." *Bautista*, 396 F.3d at 1295. The Plaintiffs don't disagree that their claims involve *at least* one foreign party and "arise out of a legal relationship, whether contractual or not, which is considered as commercial[.]" *Cosgun*, 666 F. Supp. 3d at 1280 (quoting 9 U.S.C. § 202); *see also* Resp. at 4 ("Plaintiffs do not dispute that the relationship between the Plaintiffs and CdM . . . is a commercial one that was initially documented in a written agreement entered into in Miami, Florida, and later modified by a written addendum."). So, the only remaining jurisdictional question for us is whether the parties had an agreement *in writing* "to arbitrate the subject of the dispute[.]" Resp. at 4.[4] The Contract's express terms satisfy us that they did.[5]

---

of a disputed or unliquidated debt, the agreement may be either a substituted contract or an accord resulting in discharge . . . . If, however, they make an agreement in the nature of a computation rather than of compromise of the debt, the agreement is called an 'account stated.'"). And it's irrelevant (for arbitration purposes) that "an account stated may be oral," RESTATEMENT (SECOND) OF CONTRACTS § 282, since "it is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract," *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (11th Cir. 1984) (citing *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614 (1st Cir. 1975)); *see also Northrop & Johnson*, 855 F. App'x at 474 ("[A plaintiff] cannot avoid the express terms of the agreement it signed by bringing equitable tort claims rather than breach of contract claims." (cleaned up)).

[4] While "the Eleventh Circuit has been clear—and not just once—that Convention jurisdiction hinges on *four* elements (not three)," we've elsewhere "traced the origin of this (supposed) fourth element, through several published Eleventh Circuit decisions, back to a First Circuit case that, in our view, misreads the Convention and its implementing statute." *Cosgun*, 666 F. Supp. 3d at 1281. We therefore consider three elements—not four. Still, even if we looked to the fourth jurisdictional element courts sometimes cite—"whether one or more of the parties to the agreement is not an American citizen or the commercial relationship has some reasonable relation with a foreign state," <u>United States v. Water Quality Ins. Syndicate</u>, 689 F. Supp. 3d 1171, 1178 (S.D. Fla. 2023) (Barber, J.) (cleaned up)—our Defendant would easily satisfy that element because it "is a company incorporated in the Italian Republic," Compl. ¶ 1.

[5] The Contract is governed by English law. *See* Contract § 17.4 ("The Contract and any non-contractual obligations arising out of or in connection with this Contract will be governed by and construed in

In interpreting the parties' Contract, *see Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001) ("Whether a party has agreed to arbitrate an issue is a matter of contract interpretation[.]"), we'll start, as always, with the text, *see In Re Managed Care Litig.*, 2010 WL 6532985, at *3 (S.D. Fla. Aug. 15, 2010) (Torres, Mag. J.) ("When interpreting a contract under Florida law, the Court is guided first by the language of the documents itself . . . . [W]hen the terms are unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls." (citing *Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003))), *report and recommendation adopted*, 2011 WL 1522560 (S.D. Fla. Mar. 8, 2011) (Moreno, C.J.). The Contract's arbitration clause mandates that "all disputes *arising under* this Contract . . . will be submitted to and settled by binding Arbitration in London in accordance with the Arbitration Act 1996 . . . and the rules then in force of the London Maritime Arbitrators' Association[.]" Contract § 17.3 (emphasis added). In other words, the parties agreed to arbitrate all disputes "relating to *interpretation and performance* of [the] agreement itself." *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 924 (9th Cir. 2011) (emphasis added). Our concern, then, "is not the breadth of the arbitration clause, but the breadth of the . . . Contract" itself—*viz.*, whether the Contract's text "governs" the parties' obligations that are at issue here. *Seaboard Coast Line R. Co. v. Trailer Train Co.*, 690 F.2d 1343, 1350 (11th Cir. 1982).

Section 20.1 of the Contract governs the "Publicity and Confidentiality" agreement between the parties. *See* Contract § 20.1. Under that provision, the Plaintiffs agreed to "make the Yacht available to the Builder for exhibition at the Fort Lauderdale International Boat Show [on] October 30, 2021,"

---

accordance with English law."). The parties, however, have "waived their reliance on foreign law" and agree that the Contract should be interpreted pursuant to "the law of the state of Florida, rather than the law of England." Mot. Hr'g Tr. [ECF No. 37] at 5:21–7:3; *see also Chavarria v. Intergro, Inc.*, 2018 WL 3427848, at *1 (M.D. Fla. July 16, 2018) (Merryday, J.) ("By failing to timely assert the claim, a party waives the application of foreign law." (first citing *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1257 (11th Cir. 2006); then citing *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009); then citing *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995); and then citing *Anderson v. McAllister Towing & Transp. Co.*, 17 F. Supp. 2d 1280, 1286 n.6 (S.D. Ala. 1998))).

and CDM agreed to "bear all costs in relation to such exhibition[.]" *Ibid.* The Plaintiffs "also agree[d]" to place "the Yacht at the Builder's disposal for any further promotional initiative in Florida or elsewhere, granting access to the Yacht with brokers, clients, prospect clients, allowing filming crew onboard, etc. at times that are mutually convenient for both Buyer and Builder." *Id.* § 20.1.1. And the 2022 Addendum, which "the Parties intend[ed] to supplement clause 20.1 of the Contract," Addendum § (C), further provided that, "[s]ave as provided by clause 20.1 of the Contract, the Buyer will make the Yacht available to the Builder for exhibition at the Fort Lauderdale International Boat Show [ ] 2022, and at any other following Boat Show reachable depending on where the Yacht will be located and the Buyer not using the Yacht for his personal cruising." *Id.* § 1.1. It also reiterated that CDM may access the Yacht "for any further promotional initiative in Florida or elsewhere[.]" *Ibid.*

The October 2022 Cannes Boat Show—the exhibition at issue here—falls squarely within "the scope [of § 20.1.1 as] originally intended by the parties," *Seaboard Coast Line*, 690 F.2d at 1352, because it's a "further promotional initiative in Florida or elsewhere," Contract § 20.1.1. As another boat show, the Cannes Boat Show is precisely the kind of "further promotional event"—*i.e.*, a promotional event *in addition to* the 2021 (or 2022) Fort Lauderdale International Boat Show—for which the Contract and Addendum allow CDM access to the Yacht. *See Further*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) ("Going or extending beyond what exists; additional" (cleaned up)). And the Cannes Boat Show, of course, took place in "Florida or *elsewhere*[.]" Contract § 20.1.1 (emphasis added); *see also Elsewhere*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[I]n another place[.]"). By its plain meaning, § 20.1 "governs" CDM's use of the Yacht at the 2022 Cannes Boat Show. *Seaboard Coast Line*, 690 F.2d at 1350. So, the Plaintiffs' claim that CDM failed to "perform[ ]" the obligations it incurred as a result of the Cannes Boat Show, *Cape Flattery*, 647 F.3d at 924; *see also* Compl. ¶ 44 ("Defendants have failed to reimburse Fiorentino for all costs associated with the Cannes Boat

Show."), necessarily "aris[es] under th[e] Contract"—thus bringing it within the purview of the arbitration clause, *see* Contract § 17.3.

Resisting this reading, the Plaintiffs offer three arguments for their view that their contract claims fall outside of § 17.3's arbitration provision. We reject them all.

*First*, the Plaintiffs claim that the parties' duties arising from the 2022 Cannes Boat Show stem not from the written Contract and Addendum, but from an "oral agreement reached between Jeffrey Fiorentino and the Defendants." Resp. at 9. According to the Complaint, "[s]ubsequent to the vessel's completion, . . . Fiorentino and Defendants entered into an oral agreement," through which they stipulated that CDM would display the Yacht at the 2022 Cannes Boat Show and "pay all expenses associated with the exhibition[.]" Compl. ¶¶ 40–42. Although CDM disputes that this conversation occurred, *see* Declaration of Carlo Aquilanti ("Aquilanti Decl.") [ECF No. 26-1] ¶ 23 ("In short, there was no oral agreement[.]"), we must assume that it did for the purpose of adjudicating CDM's Motion, *see Valiente v. Nexgen Global, LLC*, 2023 WL 6213583, at *4 (S.D. Fla. Sept. 25, 2023) (Altman, J.) ("When evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." (quoting *Totten v. Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016))). Even when we do that, though, the Plaintiffs' oral-agreement argument fails.

We may not consider parol evidence external to "the four corners" of the Contract "to determine the intent of the parties" when "the terms of a contract are clear and unambiguous[.]" *In Re Managed Care Litig.*, 2010 WL 6532985, at *3 (citing *Dows*, 846 So. 2d at 601); *see also Davis v. Miami-Dade Cnty. Sch. Bd.*, 2008 WL 11411387, at *1–2 (S.D. Fla. Feb. 12, 2008) (Ungaro, J.) ("[If] the [contract] is unambiguous[,] . . . parol evidence cannot be considered to ascertain the parties' intent." (citing *Fla. Moss Prods. Co. v. City of Leesburg*, 112 So. 572, 573 (Fla. 1927))). The Plaintiffs acknowledge

as much. *See* Resp. at 10 n.2 ("[T]he parties' respective rights and obligations pertaining to the Contract and Addendum arise out of those documents, not collateral documents." (citing *Century Sur. Co. v. Hallandale Beach Serv. Station, LLC*, 490 F. App'x 237, 238 (11th Cir. 2012) (noting that, where a contract's terms are clear and unambiguous, the court will apply those terms))). Even so, the Plaintiffs fail to appreciate that the 2022 Cannes Boat Show plainly falls within § 20.1's scope as a "further promotional event." Contract § 20.1.1.[6]

*Second*, the Plaintiffs argue that nothing in the written Contract "precludes the parties from entering into a later [oral] agreement[.]" Resp. at 9. Not so. The Contract's merger and modification clauses unambiguously state that the Contract "constitute[s] the whole of the agreement between the Builder and the Buyer *relating to* the Yacht," Contract § 20.7 (emphasis added), and can "only be varied in writing signed by or on behalf of the parties," *id.* § 20.8; *see also Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. 1st DCA 2005) ("[A] merger clause is a highly persuasive statement that the parties intended the agreement to be totally integrated and generally works to prevent a party from introducing parol evidence to vary or contradict the written terms." (citing RESTATEMENT (SECOND) OF CONTRACTS § 216, cmt. e (Am. L. Inst. 1981)))). And, "[w]hen contracting parties elect to adopt a

_____

[6] *Even if* the Contract were ambiguous—thus allowing the parties to offer parol evidence, *see Duval Motors Co. v. Rogers*, 73 So. 3d 261, 265 (Fla. 1st DCA 2011) ("As a general rule, evidence outside the contract language, which is known as parol evidence, may be considered only when the contract language contains a latent ambiguity." (cleaned up))—our Plaintiffs would still lose. CDM, after all, has adduced *undisputed* evidence demonstrating that the Plaintiffs read the Contract as covering the Cannes Boat Show. *See* Ex. D to Aquilanti Decl. ("Email Exhibit") [ECF No. 26-1] at 79 ("From: Gilbert Fiorentino . . . . [P]lease see attached invoice for costs relating to The Cannes Boat Show as covered in paragraph 8.3.4 of the contract."); *id.* at 76 ("From: Gilbert Fiorentino . . . . According to paragraph 3.6 of the main contract, 1.5% has been added (AND WILL CONTINUE TO BE ADDED), so the amount due is now . . . [€]22,213[.]"); *see also* Resp. at 10 n.2 (acknowledging that "the Fiorentinos may have mistakenly believed the Contract/Addendum applied" to the Cannes Boat Show); *Biggin v. RLI Ins. Co.*, 2006 WL 1232620, at *5 (M.D. Fla. May 5, 2006) ("A court may not . . . reform a contract if there was only a unilateral mistake by one of the parties." (citing *Ghahramani v. Guzman*, 768 So. 2d 535, 538 (Fla. 4th DCA 2000))). So, "the true intent of the parties" appears to be exactly what was "expressed in the written instrument." *Providence Square Ass'n v. Biancardi*, 507 So. 2d 1366, 1371 (Fla. 1987) (cleaned up).

term or condition, including one addressing the question of modification, it is not the province of a court to second guess the wisdom of their bargain, or to relieve either party from the burden of that bargain by rewriting the document." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 993 (Fla. 4th DCA 2014) (first citing *Pol v. Pol*, 705 So. 2d 51, 53 (Fla. 3d DCA 1997); then citing *Int'l Expositions, Inc. v. City of Miami Beach*, 274 So. 2d 29, 30–31 (Fla. 3d DCA 1973); and then citing *Rybovich Boat Works, Inc. v. Atkins*, 587 So. 2d 519, 521–22 (Fla. 4th DCA 1991)).

The parties' obligations with respect to CDM's use of the Yacht at the Cannes Boat Show obviously *relate* to the Yacht—thus bringing them within the purview of the "whole agreement" memorialized in the Contract. *See* Contract § 20.7; *see also Gauthier v. Hard to Stop LLC*, 2022 WL 344557, at *6 (S.D. Ga. Feb. 4, 2022) ("The ordinary meaning of the words 'relating to' is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with[.]'" (cleaned up) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992))). So, any conditions for that exhibition beyond what's already covered by the Contract, *see* Contract § 20.1.1 (agreeing to place "the Yacht at the Builder's disposal for any further promotional initiative in Florida or elsewhere"); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) ("[A] matter not covered is to be treated as not covered."), would need to be in writing to alter the complete agreement as enshrined in the text, *see Duval*, 73 So. 3d at 266 ("[If a contract] explicitly provides that 'this contract' is the entire agreement' between the parties[,] . . . anything that does not constitute part of 'this contract' is not part of the parties' agreement related to the contract."). And that's precisely what the parties did when they executed the *written* Addendum. *See* Addendum § (C) ("[T]he Parties intend to supplement clause 20.1 of the Contract."). But, because the oral agreement (by definition) *isn't* in writing, it has no operative effect on "the [written] agreement between the Builder and the Buyer relating to the Yacht." Contract § 20.7.

In the Plaintiffs' view, "[i]t would be error to require the parties to arbitrate a dispute . . . merely because a prior agreement between the same parties contained an arbitration provision." Resp. at 9 (citing *Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, 533 F.3d 1342, 1346 (11th Cir. 2008)). That's true, but it's irrelevant in the circumstances of our case because the parties' written Contract (and, therefore, its arbitration provision) expressly contemplates (and governs) the obligations at issue here—obligations that can "only be varied in writing[.]" Contract § 20.8. Since the oral agreement didn't (validly) modify those obligations *in writing*, our dispute can only "aris[e] under th[e] [written] Contract," *id.* § 17.3, and be settled at arbitration.

*Third*, the Plaintiffs contend that "the Contract and the Addendum are silent as to [CDM's] use of the vessel during the Cannes Yachting Festival, which occurred in September 2022," because "the Addendum expressly applied to the [2022] Fort Lauderdale Boat Show, which occurred in October 2022, 'and at any [other] *following Boat Show*.'" Resp. at 7 (quoting Addendum § 1.1). By the Plaintiffs' reading, the "written Contract and Addendum did not by their plain terms apply to any Boat Shows scheduled *prior* to October 2022, such as Cannes." *Id.* at 8–9 (first emphasis omitted); *see also* Deposition of Vasco Buonpensiere [ECF No. 27-1] at 25:9–11 ("Q. So the Cannes Boat Show was prior to the Ft. Lauderdale show. Correct? A. Yes."). But that's just wrong.

The Addendum, which the parties executed "to supplement clause 20.1 of the Contract," Addendum § (C); *see also Supplemental*, BLACK'S LAW DICTIONARY ("supplying something additional"), doesn't displace the original Contract's broad language allowing CDM access to the Yacht at "any further promotional initiative in Florida or elsewhere," Contract § 20.1.1. Granted, the Addendum says that, "[i]n the event of any discrepancy between any of the provisions of the Addendum and those of the Contract, the provisions of this Addendum shall prevail." Addendum § 3.1. But we have no such discrepancy here.

Section 1.1 of the Addendum—the Section that requires the Plaintiffs to "make the Yacht available . . . for exhibition at the [2022 FLIBS] . . . and at any other following Boat Show"—expressly applies "[s]ave as provided by clauses 20.1 of the Contract[.]" *Id.* § 1.1. By its own terms, then, § 1.1 of the Addendum is subordinate to § 20.1 of the Contract, *see Savings Clause*, BLACK'S LAW DICTIONARY ("[A textual] provision exempting from coverage something that would otherwise be included."); SCALIA & GARNER at 183 ("[T]he specific provision is treated as an exception to the general rule."), and to the latter's coverage of "any further promotional initiative in Florida or elsewhere," Contract § 20.1.1; *see also* SCALIA & GARNER at 156 ("Material within a[ ] . . . subpart relates . . . to that subpart. . . . In a paper contract, the formatting has credence: the parties, after all, saw and signed the document as prepared."). So, while the Addendum "expressly applied to the [2022] Fort Lauderdale Boat Show . . . [and] any [other] following Boat Show," Addendum § 1.1, nothing in that Section altered the parties' existing obligations under § 20.1 of the original Contract.

Through the Contract and its Addendum, the parties have entered into an agreement governing CDM's use of the Yacht at "promotional events" beyond the 2021 FILBS, *see* Contract § 20.1.1, including the 2022 Cannes Boat Show. Because the Plaintiffs' breach-of-contract and account-stated claims are "related—with at least some directness—to performance of" § 20.1.1 of the Contract, they are "disputes 'arising out of' the [C]ontract." *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1367 (11th Cir. 2008) (quoting *Telecom Italia*, 248 F.3d at 1114). In accordance with the plain terms of the arbitration clause, then, these claims *must* be resolved at arbitration. *See* Contract § 17.3 ("[A]ll disputes arising under this Contract . . . will be submitted to and settled by binding Arbitration in London in accordance with the Arbitration Act 1996[.]")

## II.    The Plaintiffs' Copyright Claim

CDM also seeks to submit the Plaintiffs' copyright-infringement claim to arbitration, arguing that this claim likewise "arise[s] under th[e] Contract[.]" *Ibid.*; *see also* Mot. at 9 ("All three counts of

the Plaintiffs' Complaint arise from the Contract."). Count III alleges that CDM has "continued to use, without authorization, copyrighted photographs of the vessel in violation of Fishsplorer's registered copyright." Compl. ¶ 57. For that allegedly unauthorized use, the Plaintiffs seek damages under the Copyright Act of 1976, *see* Compl. at 10 (demanding "actual damages suffered by Plaintiff as a result of the infringement . . . or, in the alternative, at Plaintiff's election, statutory damages for infringement of each separate copyright as set forth in 17 U.S.C. § 504"). But, while the Copyright Act (obviously) provides a cause of action for copyright infringement, *see* 17 U.S.C. § 504 ("[A]n infringer of copyright is liable for either . . . the copyright owner's actual damages and any additional profits of the infringer . . . or statutory damages[.]" (cleaned up)), a plaintiff's ability to assert that claim in federal court is subject to any applicable arbitration agreement, *see* 21 Samuel Williston, Williston on Contracts § 57:182 (4th ed. 2024) ("A broad arbitration clause in a publishing or licensing agreement encompasses Copyright Act claims, and an arbitrator has jurisdiction to base an award on the Copyright Act where 'the arbitration clause was broad enough to encompass Copyright Act claims which required interpretation of the contract.'" (quoting *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228 (2d Cir. 1982))); *see also NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 815 (6th Cir. 2008) ("It is sufficient that a court would have to reference the 1998 Agreement [containing the arbitration provision] for part of [the plaintiff's] direct infringement claim. Under these circumstances, we find that the copyright infringement claim . . . falls within the scope of the arbitration agreement.").

Here, the arbitration provision covers the Plaintiffs' copyright claim because that claim "relate[s] to [the] interpretation and performance" of the Contract, *Cape Flattery*, 647 F.3d at 924, and thus "aris[es]" from it, Contract § 17.3. The Contract specifically contemplates CDM's use of images of the Yacht in its marketing and promotional materials, stating that:

> [t]he Builder may take photographs and video footage of the Yacht during construction and sea trials and at the time of delivery. The Buyer . . . will allow the publication of images and brochure of the Yacht for advertising purposes[.]

*Id.* § 20.1.

The Plaintiffs' copyright claim alleges that CDM "use[d] . . . [the] copyrighted photographs of the vessel in . . . promotional material," Compl. ¶¶ 57–58—*i.e.*, "the very same acts that [CDM] was authorized to do under the licensing agreement" that's included in § 20.1, *Polvent v. Global Fine Arts, Inc.*, 2014 WL 4672442, at \*3 (S.D. Fla. Sept. 18, 2014) (Moreno, J.). As such, "these acts were a 'foreseeable result' of the performance of the underlying agreement," *ibid.*, placing them squarely within the scope of the arbitration provision, *see Hemispherx Biopharma*, 553 F.3d at 1366 n.16 (claims "arise under" an arbitration agreement when the claims were a "foreseeable result" of the performance of the underlying agreement).

The Plaintiffs try to parry this conclusion in two ways—both unpersuasive. *First*, they fixate on the first sentence of the Publicity and Confidentiality provision, reading it to mean that "the Contract only permitted CdM to take photographs *prior to delivery*." Resp. at 11. But, while the Contract may limit when CDM can *take* photographs and video footage, *see* Contract § 20.1 ("The Builder may take photographs and video footage of the Yacht during construction and sea trials and at the time of delivery."), it includes no such limitation on when CDM may *publish* images of the Yacht (just as it doesn't circumscribe *which* images CDM may use), *ibid.*; *see also* SCALIA & GARNER at 101 ("General terms are to be given their general meaning."). And we won't be rewriting § 20.1 to include those omitted conditions. *See* SCALIA & GARNER at 94 ("The absent provision cannot be supplied by the courts." (cleaned up)). It's thus irrelevant that the images CDM published were "taken after delivery by Fiorentino[.]" Resp. at 11 (emphasis omitted). Because the Plaintiffs' copyright claim is predicated on CDM's "publication of images . . . of the Yacht," Contract § 20.1, it falls neatly within the scope of the Contract and its arbitration provision.

*Second*, the Plaintiffs offer two arguments for their position that "*Polvent* is easily distinguish[able]" from our case. Resp. at 14. But we don't think it is.

*One*, they tell us that the *Polvent* Court "compelled arbitration on grounds not related to the copyright claim[.]" *Ibid.* (citing *Polvent*, 2014 WL 4672442, at *3). *Polvent* (it's true) recognized that arbitration was *separately* required because the "Plaintiff's challenge [was] . . . directed to the validity of the contract as a whole, i.e. whether it had expired[,] [and] [a]ny 'challenge to the validity of a contract as whole . . . must go to the arbitrator.'" *Polvent*, 2014 WL 4672442, at *3 (quoting *Shea v. BBVA Compass Bancshares, Inc.*, 2013 WL 869526, at *4 (S.D. Fla. Mar. 7, 2013) (Moore, J.)). It's equally true, though, that the court's foreseeable-result analysis provided an *independent* and *sufficient* basis to send the copyright claim to arbitration. *See ibid.* ("*Moreover*, Plaintiff's copyright claim alleges . . . the very same acts that Global Fine Arts was authorized to do under the licensing agreement. Given the broad language of this arbitration clause, the Court finds these acts were a 'foreseeable result' of the performance of the underlying agreement." (emphasis added) (quoting *Hemispherx Biopharma*, 553 F.3d at 1366 n.16)); *see also Hemispherx Biopharma*, 553 F.3d at 1368 ("[T]he question [is] whether the present dispute was a foreseeable result of the performance of the licensing agreement."). And that's the same conclusion we've come to here.[7]

*Two*, the Plaintiffs claim that "the purpose of the Contract was for the construction of a yacht, not the licensing and distribution of photographs of the yacht." Resp. at 14. The Plaintiffs never really explain why that's relevant. We assume that they're trying to craft some distinction between the underlying contract in *Polvent*, which was only a "licensing agreement," *Polvent*, 2014 WL 4672442, at

---

[7] For what it's worth, our Plaintiffs, like Ms. Polvent, are *also* challenging the "validity" of the licensing provision in § 20.1—"i.e. whether it had expired." *Polvent*, 2014 WL 4672442, at *3; *cf.* Resp. at 11 ("Defendants' unauthorized use of copyrighted photographs taken after delivery to Plaintiffs goes well beyond the rights afforded them under the Contract. The above language does not permit CdM to take photographs (or use others' photographs) at its whim, in perpetuity, nor does it give CDM the right to use Copyrighted Images that they did not take or commission."); Compl. ¶ 36 ("Fiorentino . . . specifically revoked any prior permissions he had granted for Defendants to use Fiorentino's copyrighted images[.]"). So, the Plaintiffs' purported distinction between our case and *Polvent* is *both* irrelevant as a matter of law *and* incorrect as a matter of fact.

*3, and our Contract's "Publicity and Confidentiality" provision, which the Plaintiffs view as merely "incidental" to the overall Contract, Resp. at 14. But that's a distinction without a difference.

Whatever the Contract's purpose is (or purposes *are*),[8] the arbitration clause isn't limited to disputes arising from "the construction of a yacht," Resp. at 14—it covers "*all* disputes arising under [the] Contract," Contract § 17.1 (emphasis added). And, as in *Polvent*, the Plaintiffs' copyright claim is based on (at least some of) the "the very same acts that [CDM] was authorized to do" under the Contract, bringing it "within the ambit of the arbitration clause." *Polvent*, 2014 WL 4672442, at *3.

### III. The Plaintiffs' Affirmative Defenses

Having established that each of the Plaintiffs' claims meets the jurisdictional prerequisites for arbitration, we'll now consider whether "one of the Convention's affirmative defenses applies." *Bautista*, 396 F.3d at 1294; *see also* 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]"). At this stage of the case, the affirmative defenses available to the Plaintiffs "encompass only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." *Bautista*, 396 F.3d at 1302 (cleaned up).

The Plaintiffs first maintain that the fraud defense applies here because "Buonpensiere, as an inducement to contract, fraudulently stated that CdM would not enforce the arbitration provision." Resp. at 16 (first citing Declaration of Jeffrey Fiorentino ("J. Fiorentino Decl.") [ECF No. 29-1] ¶¶ 4– 8; and then citing Declaration of Gilbert Fiorentino ("G. Fiorentino Decl.") [ECF No. 28] ¶¶ 4–8). According to the Plaintiffs, Buonpensiere did so "on three separate occasions," J. Fiorentino Decl. ¶

---

[8] *Cf.* Aristotle, Nicomachean Ethics 9 (W.D. Ross trans., Batoche Books 1999) (c. 350 B.C.) ("[C]learly not all ends are final ends[.]").

4, with one of those assurances taking place before the Contract was signed.[9] But, even if Buonpensiere told the Plaintiffs, before the Contract's execution, that CDM wouldn't enforce the arbitration provision, *but see* Reply Declaration of Vasco Buonpensiere [ECF No. 31-1] ("That is untrue[.]"), Florida law prevents us from using the Plaintiffs' parol evidence to nullify the effects of the written arbitration clause.

To be sure, Florida law recognizes a fraudulent-inducement exception to the general rule against parol evidence, allowing "parol evidence [to be] admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, [even] though it may vary, change, or reform the instrument." *Mallard v. Ewing*, 164 So. 674, 678 (Fla. 1935); *see also Ben-Yishay v. Mastercraft Dev., LLC*, 553 F. Supp. 2d 1360, 1367 (S.D. Fla. 2008) (Moore, J.) ("[D]efenses such as fraud, unconscionability and duress are governed by state law."). But that exception "does not apply where 'the alleged oral agreement relate[s] to the identical subject matter embodied in the written agreement and . . . directly contradict[s] an express provision of the written agreement." *Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000) (first quoting *Linear Corp. v. Standard Hardware Co.*, 423 So. 2d 966, 968 (Fla. 1st DCA 1982); and then citing *Bond v. Hewitt*, 149 So. 606, 608 (Fla. 1933)).

Here, Buonpensiere's statement—"Look, my attorneys make me put in the arbitration in London clause but I assure you that we will never enforce that provision . . . [and] will agree to court

---

[9] In his Declaration, Gilbert Fiorentino *first* alleges that, "[o]n Wednesday, January 23, 2019[,] . . . Buonpensiere had a separate conversation with Jeffrey and [Gilbert Fiorentino] in which he stated words to the effect of, 'Look, my attorneys make me put in the arbitration in London clause but I assure you that we will never enforce that provision. We will agree to court in Florida if that's what you want.'" G. Fiorentino Decl. ¶ 5. *Second*, Fiorentino says that, "on December 8, 2021 . . . Buonpensiere stated again that he/CDM would not enforce the arbitration provision and he agreed to include that in a written addendum to the Contract." *Id.* ¶ 7. *Third*, he claims that, "on January 8, 2022 . . . Buonpensiere stated that his lawyers would not allow him to remove the arbitration provision but he had already agreed twice not to enforce the provision and that should be enough[.]" *Id.* ¶ 8. Jeffrey Fiorentino offers near-identical allegations in his Declaration. *See* J. Fiorentino Decl. ¶¶ 5, 7–8; *see also id.* ¶ 9 ("On each of these three occasions I took Mr. Buonpensiere at his word that CDM would not enforce the arbitration provision.").

in Florida," G. Fiorentino Decl. ¶ 6—plainly "relate[s]" to the arbitrability of disputes, *i.e.*, "the identical subject matter embodied in the written agreement" in the arbitration clause, *Linear Corp.*, 423 So. 2d at 968. And it "*directly* contradict[s]," *ibid.* (emphasis added), that clause's unambiguous requirement that "all disputes arising under this Contract . . . will be submitted to and settled by binding Arbitration in London," Contract § 17.3. Buonpensiere's pre-execution statement is, therefore, "not admissible under the inducement exception to the parol evidence rule." *Ungerleider*, 214 F.3d at 1284.

We also reject the Plaintiffs' contention that CDM "waived" the right to enforce the arbitration provision when "Buonpensiere affirmatively disclaimed any intention to enforce [it]." Resp. at 16–17. As to any pre-execution statements, the Plaintiffs' waiver argument is vitiated by the Contract's merger clause, which explicitly disclaimed "all prior . . . representations (whether written or oral) concerning [the Contract's] subject matter which may have been made by or on behalf of the Builder." Contract § 20.7; *see also Sas v. Serden Tech., Inc.*, 2013 WL 12086638, at *7 (S.D. Fla. Dec. 3, 2013) (Williams, J.) ("Where the written contract contains a merger clause and both parties had an opportunity to participate in drafting the contract, a plaintiff's reliance on a separate oral promise is not justifiable[.]" (first citing *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 798 (11th Cir. 2005); then citing *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1315 (11th Cir. 1998); and then citing *Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984))).

Nor do Buonpensiere's post-execution oral assurances constitute a valid waiver of any contractual terms. The Contract clearly states that "[n]o claim or right arising out of this Agreement can be waived or discharged by one Party, in whole or in part unless in writing," Contract § 20.9, so "the 'defenses of waiver and estoppel [are] defeated as a matter of law by the [anti-waiver] provisions of the contract itself,'" *Dioguardi v. Giroski, LLC*, 2013 WL 12092475, at *2 (S.D. Fla. Mar. 20, 2013) (Martinez, J.) (quoting *Nat'l Home Cmty., LLC v. Friends of Sunshine Key, Inc.*, 874 So. 2d 631, 634 (Fla.

3d DCA 2004)); *see also Nat'l Home Cmty.*, 874 So. 2d at 634 ("Florida courts have consistently enforced these types of clauses." (first citing *Rybovich Boat Works*, 587 So. 2d at 519; then citing *Gergora v. Flynn*, 486 So. 2d 5 (Fla. 3d DCA 1986), *rev. denied*, 500 So. 2d 544 (Fla. 1986); then citing *Raimondi v. I.T. Chips, Inc.*, 480 So. 2d 240 (Fla. 4th DCA 1985); then citing *Eskridge v. Macklevy, Inc.*, 468 So. 2d 337 (Fla. 1st DCA 1985), *rev. denied*, 478 So. 2d 54 (Fla. 1985); and then citing *Philpot v. Bouchelle*, 411 So. 2d 1341 (Fla. 1st DCA 1982)))[10] So, that defense likewise fails.

\* \* \*

Since each of the Plaintiffs' claims meets the jurisdictional prerequisites for arbitration—and because the Plaintiffs have failed to show that any affirmative defenses preclude arbitration—we must compel the parties to arbitrate this dispute in accordance with § 17.3 of the Contract. *See Bautista*, 396 F.3d at 1294–95 ("A district court must order arbitration unless (1) the four jurisdictional prerequisites are not met or (2) one of the Convention's affirmative defenses applies." (cleaned up)). Where, as here, "the issue involved . . . is referable to arbitration," a district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. And the parties agree that a stay is warranted. *See* Mot. at 1 (requesting that we "stay[ ] this action pending the outcome of the arbitration"); Resp. at 18 ("Plaintiffs respectfully submit that dismissal would not be appropriate, and that the Court should stay the action pending arbitration."). We'll therefore **STAY** this case while the parties arbitrate their dispute in London.

---

[10] For these same reasons, we can also reject the Plaintiffs' conclusory statement that "CdM should be equitably estopped from seeking to compel arbitration." Resp. at 17 (citing *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 n.12 (Fla. 2001)). We'd probably have done that regardless, since the Plaintiffs made "nothing more than a passing reference" to that defense. *Walter Int'l Prods. Inc. v. Salinas*, 650 F.3d 1402, 1413 n.7 (11th Cir. 2011); *see also In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

CONCLUSION

After careful review, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Renewed Motion to Stay Action and Compel Arbitration [ECF No. 24] is **GRANTED**.

2. The parties are **COMPELLED** to submit this dispute to "binding Arbitration in London in accordance with the Arbitration Act [of] 1996 (or any re-enactment or modification for the time being in force) and the rules then in force of the London Maritime Arbitrators' Association[.]" Contract § 17.3.

3. Every **ninety days** from the date of this Order, the parties shall file a joint status report on the progress of their arbitration proceedings.

4. Within **fifteen days** of the arbitration's conclusion, the parties shall file a joint notice describing the outcome of arbitration.

5. This case shall remain **STAYED** and **CLOSED** pending the completion of arbitration. All other deadlines are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on August 8, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record